GRANITE MANAGEMENT CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant,

No. 95–515C.

United States Court of Federal Claims.

Aug. 7, 2002.

---

Charles J. Cooper, Washington D.C., attorney of record for plaintiff and Michael W.

Kirk and David H. Thompson, co-counsel, Washington, D.C. and Michael A. Kahn and Michael F. Kelleher, co-counsel, San Francisco, California.

Delfa Castillo, Department of Justice, Washington, D.C., with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director.

## OPINION and ORDER

FUTEY, Judge.

This *Winstar*-related case is before the court on plaintiff's motion for partial summary judgment as to liability and defendant's corresponding cross-motion for summary judgment. Plaintiff asserts it entered into contracts with defendant when it acquired four failing thrifts in 1986. These contracts were premised on assistance agreements, merger agreements, and Federal Home Loan Bank Board (FHLBB) resolutions. Plaintiff maintains the contracts allowed it to use the purchase method of accounting to record the excess of the failing thrifts' liabilities over their assets as an intangible asset to be amortized over twenty-five years. Plaintiff contends the contracts permitted it to utilize the intangible asset in each transaction for regulatory capital compliance purposes. Plaintiff also asserts defendant promised that direct cash contributions it provided in two of the acquisitions could serve as credits to be included in plaintiff's regulatory capital. Plaintiff argues defendant's enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), (codified at 12 U.S.C. § 1464), breached these contracts because the statute no longer allowed plaintiff to use the intangible asset or the cash contributions for regulatory capital compliance purposes.

Defendant insists that no contracts were formed at the time of the acquisitions because plaintiff's only goal was to obtain the right to open branches in additional states. Defendant also argues that plaintiff identified the intangible asset in each transaction as "state branching rights," which is different from the supervisory goodwill that existed in

*United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Defendant believes this difference precludes any comparison to that seminal case. In addition, defendant asserts there were no contracts because of the five-year forbearance periods, the expiration of the assistance agreements, and the fact that plaintiff explicitly bore the risk of regulatory change in one of the transactions. With respect to the direct cash credits, defendant contends it never intended for them to be used for capital compliance purposes.

## Factual Background

### I. Plaintiff's Acquisitions

Plaintiff, Granite Management Corporation, is a company located in San Francisco, California. Prior to September 30, 1994, plaintiff was known as First Nationwide Financial Corporation (FNFC). FNFC's principal business was First Nationwide Savings (FNS), which operated from San Francisco. Ford Motor Company (Ford) acquired FNFC in December 1985. Thereafter, plaintiff was a wholly owned subsidiary of Ford.

In March 1986, FNS had $11.9 billion in assets and $9.1 billion in deposits. It had several branch offices in California, and also had thirty-one locations in New York, thirty-four in Florida, and nineteen in Hawaii. In June 1986, FNS was renamed First Nationwide Bank (FNB).[1] At that time, FNB embarked upon a nationwide expansion plan with the goal of becoming one of the top financial firms in the country. One method it used to meet this goal was to establish First Nationwide branches in select K–Mart department stores. It also pursued the acquisition of numerous thrifts across the country.

### A. *The State Savings and Citizens Home transaction*

In May 1986, plaintiff began negotiations to acquire State Savings & Loan Company of South Euclid, Ohio (State Savings) and Citizens Home Savings Company of Lorain, Ohio (Citizens Home). Both of these thrifts were failing or in danger of failing. Indeed,

FHLBB appointed the Federal Savings & Loan Insurance Corporation (FSLIC) as receiver for State Savings and Citizens Home on June 27, 1986.

On May 2, 1986, plaintiff sent its proposal to the Federal Home Loan Bank (FHLB) of Cincinnati expressing its interest in acquiring State Savings and Citizens Home. Said proposal did not include any express reference to the accounting of supervisory goodwill or its amortization. On June 27, 1986, First Nationwide Savings of Ohio (FNS Ohio), a wholly-owned subsidiary of plaintiff, signed separate acquisition agreements with FSLIC that addressed a merger with the failing thrifts. Also on that date, plaintiff and FNS Ohio entered into a merger agreement to combine FNS Ohio with plaintiff. These agreements allowed plaintiff to acquire substantially all of the assets and liabilities of State Savings and Citizens Home. Both acquisition agreements and the merger agreement made clear that plaintiff's obligation to complete the acquisitions was expressly conditioned upon the execution of an assistance agreement, pursuant to which FSLIC would provide assistance to plaintiff.

As contemplated by these agreements, plaintiff, FNS Ohio, and FSLIC executed an assistance agreement on June 27, 1986 (the State Savings/Citizens Home Assistance Agreement). This document had an integration clause stating that the agreement between plaintiff and the government was premised on the assistance agreement, the acquisition agreements, and the FHLBB resolutions approving the transaction:

§ 19 *Entire Agreement, Severability.*

(a) This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Acquisition Agreements and any resolutions or letters issued contemporaneously with this Agree-

---

1. In September 1994, FNB changed its name to Granite Savings Bank. Effective on June 30, 1995, Granite Savings Bank merged into plain-

tiff. By operation of law, plaintiff has assumed all rights and obligations of Granite Savings Bank.

ment by the [FHLBB] or the [FSLIC]. . . . [2]

The State Savings/Citizens Home Assistance Agreement also specified the accounting principles to be utilized in accounting for the transaction:

§ 13 *Accounting Principles.* Except as otherwise provided herein, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the [FHLBB] or the [FSLIC], or any resolution or action of the [FHLBB] approving, or adopted concurrently with, this Agreement, then this Agreement, such regulations or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations or any such resolution or action. If there is a conflict between such regulations and the [FHLBB's] resolution or action, the [FHLBB's] resolution or action shall govern. For the purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the [FHLBB] or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either. If there is a conflict between what is required by the FASB and what is required by the [FHLBB], the [FHLBB's] interpretation shall govern.[3]

The assistance agreement expired on June 27, 1990.

Also on June 27, 1986, FHLBB issued Resolution No. 86–664 approving the transaction. This resolution stated that plaintiff was to:

furnish an analysis, accompanied by a concurring opinion from its independent public accountants . . . which shall (a) specifically describe . . . *any intangible assets*, including goodwill . . . arising from the Acquisition and Merger . . . , and (b) substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, . . . and the related amortization periods and methods . . . . [4]

The resolution also authorized FSLIC to issue a forbearance letter.

Plaintiff fulfilled all obligations and conditions attendant to its agreement with the government, and timely submitted a letter from its independent accountant that justified the reasonableness of the amounts and amortization periods attributed to the intangible asset.[5] The intangible resulting from the transaction, which plaintiff recognized and treated as regulatory capital, was to be amortized on a straight-line basis over a twenty-five year period. Prior to the enactment of FIRREA, neither FHLBB nor FSLIC disputed the amount of the intangible asset shown on plaintiff's books in connection with this transaction.

### B. *The St. Louis Federal transaction*

On June 19, 1986, plaintiff sent a proposal to the FHLB of Des Moines expressing its interest in acquiring St. Louis Federal Savings and Loan Association of St. Louis, Missouri (St. Louis Federal). Said proposal was silent with respect to any twenty-five year amortization period for the intangible created in this transaction. On or about December 22, 1986, plaintiff acquired St. Louis Federal by merger. Specifically, plaintiff and St. Louis Federal executed a document entitled

---

2. Plaintiff's Motion For Partial Summary Judgment As To Liability (Pl.'s Mot.), Appendix (App.), Exhibit (Ex.) 4 at 947.

3. *Id.* at 943.

4. *Id.,* Ex. 5 at 1126 (emphasis added).

5. Plaintiff referred to the intangible asset as branching rights for generally accepted accounting principles (GAAP) purposes and as supervisory goodwill for regulatory accounting principles (RAP) purposes. The forms used for regulatory reporting, however, did not require plaintiff to label the intangible asset. Transcript of Oral Argument (Tr.) at 23. To avoid confusion on the name of the asset, the court chooses to refer to it throughout this opinion as simply an "intangible asset."

"Merger Agreement and Plan of Merger" on December 22, 1986. This agreement made clear that the merger was conditioned upon the execution of an assistance agreement between plaintiff and FSLIC.

As contemplated by the merger agreement, plaintiff and FSLIC signed an assistance agreement on December 22, 1986 (the St. Louis Federal Assistance Agreement). In that agreement, FSLIC promised to make a $75 million cash contribution. In addition, the St. Louis Federal Assistance Agreement contained an integration clause that was closely similar to the integration clause appearing in the State Savings/Citizens Home Assistance Agreement. It specified that the parties' agreement included the merger agreement, the FHLBB resolutions approving the transaction, and a forbearance letter issued by FHLBB in connection with the transaction. Finally, the St. Louis Federal Assistance Agreement contained a provision nearly identical to the "Accounting Principles" section in the State Savings/Citizens Home Assistance Agreement. The expiration date for the assistance agreement was December 22, 1988.

On December 19, 1986, FHLBB issued Resolution No. 86–1257 approving the transaction. This resolution expressed the parties' agreement on the use of purchase method accounting and the regulatory capital treatment of the FSLIC cash contribution:

> RESOLVED FURTHER, That, in accounting for the St. Louis Merger, FNB shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the [FHLBB] and the FSLIC, except to the extent of any or all of the following departures from GAAP:
>
> (a) Purchase accounting shall be used to reflect the St. Louis Merger on the books of FNB;
>
> (b) The cash contribution by the FSLIC to FNB, pursuant to the Assistance Agreement, may be deemed a contribution to net worth and may be booked a direct credit to FNB's net worth;
>
> (c) The value of *any intangible assets* resulting from the St. Louis Merger shall be amortized by FNB over a period of 25 years by the straight line method; and

RESOLVED FURTHER, That no later than ninety (90) days following the Effective Date of the St. Louis Merger, FNB shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants (which indicates that the Merger was consummated in accordance with generally accepted accounting principles except as otherwise authorized by the [FHLBB]), satisfactory to the Supervisory Agent and the Office of Regulatory Policy, Oversight and Supervision, which shall (a) specifically describe as of the Effective Date of the St. Louis Merger *any intangible assets,* including goodwill or the discount and premiums arising from the Merger to be recorded on FNB's books and (b) substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discount and premiums .... [6]

The resolution also authorized FSLIC to issue a letter of forbearance, which it did so on December 22, 1986.

Plaintiff fulfilled all obligations and conditions attendant to its agreement with the government, and timely submitted a letter from its independent accountant that justified the reasonableness of the amounts and amortization periods attributed to the intangible asset. The intangible resulting from the transaction, which plaintiff recognized and treated as regulatory capital, was to be amortized on a straight-line basis over a 25–year period. Also, plaintiff recorded the $75 million FSLIC cash contribution in its books as a direct credit to its regulatory capital. Prior to the enactment of FIRREA, neither FHLBB nor FSLIC challenged the amount of the intangible asset shown on plaintiff's books in connection with this transaction. Nor did those agencies dispute the fact that the intangible reflected the accounting treat-

---

**6.** Pl.'s Mot.App., Ex. 9 at 1547 (emphasis added).

ment agreed to by FHLBB, or that plaintiff treated the FSLIC cash contribution as a regulatory capital credit.

### C. *The Lincoln Federal transaction*

On or about December 29, 1986, plaintiff acquired Lincoln Federal Savings and Loan of Louisville, Kentucky (Lincoln Federal) by merger. Plaintiff and FSLIC signed an assistance agreement on December 30, 1986 (the Lincoln Federal Assistance Agreement). In that agreement, FSLIC promised to make a $93 million cash contribution, and expressly guaranteed that "[f]or purposes of reports to the [FHLBB] ... [the contribution] shall be credited to [plaintiff's] net worth account." [7] In addition, the Lincoln Federal Assistance Agreement contained: (1) an integration clause and (2) an "Accounting Principles" section. These provisions were practically identical to their counterparts in the State Savings/Citizens Home Assistance Agreement and the St. Louis Federal Assistance Agreement. The assistance agreement terminated on December 30, 1988.

On December 26, 1986, FHLBB issued Resolution No. 86–1292 approving the transaction. This resolution used terms that were virtually identical to: (1) the language used in the FHLBB resolution approving the St. Louis Federal transaction; (2) the parties' agreement regarding the use of purchase method accounting; and (3) the regulatory capital treatment of the FSLIC cash contribution. The resolution expressed, in pertinent part:

> RESOLVED FURTHER, That, in accounting for the Merger, FNB shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the [FHLBB] and the FSLIC, except to the extent of any or all of the following departures from GAAP:
>
> (a) Purchase accounting shall be used to reflect the Merger on the books of FNB;
>
> (b) The cash contribution by the FSLIC to FNB, pursuant to the Assistance

> Agreement, may be deemed a contribution to net worth and may be booked as a direct credit to FNB's net worth;
>
> (c) The value of *any intangible assets* resulting from the Merger shall be amortized by FNB over a period of twenty-five (25) years by the straight line method; and

RESOLVED FURTHER, That, no later than ninety (90) days following the Effective Date, FNB shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants (which indicates that the Merger was consummated in accordance with generally accepted accounting principles except as otherwise authorized by the [FHLBB] ), satisfactory to the Supervisory Agent and the Office of Regulatory Policy, Oversight and Supervision, which shall (a) specifically describe, as of the Effective Date, *any intangible assets*, including goodwill, and the discount and premiums arising form the Merger to be recorded on FNB's books, and (b) substantiate the *reasonableness and conformity* with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discount and premiums .... [8]

The resolution also allowed FSLIC to issue a forbearance letter, which it did so on January 6, 1987.

Plaintiff fulfilled all obligations and conditions attendant to its agreement with the government, and timely submitted a letter from its independent accountant justifying the reasonableness of the amounts and amortization periods attributed to the intangible asset. The intangible resulting from the transaction, which plaintiff recognized and treated as regulatory capital, was to be amortized on a straight-line basis over a 25–year period. Also, plaintiff recorded the $93 million FSLIC cash contribution in its books as a direct credit to its regulatory capital. Prior to the enactment of FIRREA, neither FHLBB nor FSLIC challenged the amount of the intangible asset shown on plaintiff's

---

7. *Id.,* Ex. 11 at 2154–55.

8. *Id.,* Ex. 12 at 2057–58 (emphasis added).

books in connection with this transaction. Nor did those agencies ever dispute the fact that the intangible reflected the accounting treatment authorized and approved by FHLBB, or that plaintiff treated the FSLIC cash contribution as a regulatory capital credit.

## II. Plaintiff's Acquisition Of State Branching Rights[9]

As a result of these three transactions, plaintiff was able to expand its business into many states across the country. Indeed, defendant agreed to allow plaintiff to enter these states despite the stringent banking regulations at that time, which made such expansion difficult. The acquisition of State Savings and Citizens Home permitted plaintiff to enter Ohio, Pennsylvania, and Colorado. The St. Louis Federal transaction allowed plaintiff to expand to Missouri, Illinois, Michigan, and New Jersey. The Lincoln Federal acquisition provided plaintiff rights in Kentucky, Maryland, and Virginia. Plaintiff also entered several other transactions in 1987 and 1988 to further expand nationwide. For example, plaintiff acquired thrifts in Westfield, New Jersey; Birmingham, Michigan; Dearborn, Michigan; Englewood, Colorado; and Denver, Colorado.[10]

Plaintiff allocated the total of the fair value of the liabilities in excess of the fair value of the assets in the three transactions at issue to an intangible asset. For GAAP purposes, plaintiff listed this intangible asset as interstate branching rights, which it considered an identifiable intangible asset. For RAP purposes, plaintiff recorded it as an *un* identifiable intangible asset known as supervisory goodwill.[11] The amounts of the intangible asset were $60,369,000 for the State Savings/Citizens Home transaction; $100,412,000 for the St. Louis Federal transaction; and $21,900,000 for the Lincoln Federal transaction.

## III. FIRREA And Plaintiff's Claim For Breach Of Contract

On August 9, 1989, FIRREA became effective, and it: (1) abolished FSLIC and transferred its functions to other agencies; (2) created the Savings Association Insurance Fund, managed by Federal Deposit Insurance Corporation; (3) abolished FHLBB; and (4) created the Office of Thrift Supervision in the Department of Treasury. It also provided, in part, that tangible capital cannot include any intangible assets, and that only limited amounts of core capital may consist of supervisory goodwill. These amounts were phased out by 1994. It further stated that supervisory goodwill must be amortized for a period not to exceed twenty years.

After the enactment of FIRREA, plaintiff maintained its right to remain in the states it had entered pursuant to the three acquisitions at issue. Plaintiff argues, however, that the enactment of FIRREA breached the government's express contractual promises allowing it to include the intangible asset and the FSLIC cash contributions for regulatory capital compliance purposes. Thus, on August 7, 1995, plaintiff filed a complaint with this court asserting five counts: (1) breach of contract; (2) breach of implied-in-fact contract; (3) promissory estoppel; (4) failure of consideration and frustration of purpose; and (5) Fifth Amendment taking. Plaintiff seeks damages and restitution.

On December 27, 1996, plaintiff filed a short-form motion for partial summary judgment in accordance with the court's omnibus case management order. Defendant filed a cross-motion for summary judgment on April 30, 1997. There is also a series of short briefs that were filed in response to the court's order to show cause why summary judgment should not be entered in this case, in light of the court's decision in *California Fed'l Bank, F.S.B. v. United States*, 245 F.3d 1342 (Fed.Cir.2001). The court appended an order to that opinion requiring defendant to

---

9. At oral argument, the parties sometimes referred to these rights as "States rights" or "branching rights," and at other times as "territorial rights." Since these terms are synonymous, the court refers to the intangible at issue as branching rights throughout this opinion.

10. Plaintiff's original complaint filed on August 7, 1995, included claims for these five thrifts. Plaintiff dropped these claims in its amended complaint submitted on September 30, 1999.

11. Tr. at 23.

respond in all *Winstar*-related cases where the plaintiffs had filed a motion for summary judgment. This generated a series of responsive briefs.

Plaintiff filed an amended complaint on October 6, 1999. Subsequently, defendant filed a supplemental cross-motion with its motion to dismiss the non-contractual arguments (Counts III–V) of plaintiff's complaint on October 10, 2000.[12] Plaintiff also filed a supplemental motion for summary judgment on its breach of contract claims on October 10, 2000. Judge Loren Smith transferred this case to the undersigned judge on February 1, 2002. On May 10, 2002, the parties submitted another set of supplemental briefs discussing recent developments in the *Winstar*-related case law. Oral argument on the parties' contractual liability motions was held on July 10, 2002.

*Discussion*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS*, 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the opposing party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir. 1987). Alternatively, if the moving party can show that there is an absence of evidence to support the opposing party's case, the burden then shifts to the opposing party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve

any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992)).

Defendant maintains there was no contractual relationship between the parties that addressed the treatment of the intangible asset and the FSLIC cash contributions. Indeed, defendant attempts to distinguish *Winstar* because the intangible asset in this case was labeled branching rights instead of supervisory goodwill, at least for GAAP purposes. Defendant asserts it was rational for plaintiff to acquire the four failing thrifts at issue without contractual guarantees because plaintiff's main goal was to obtain branching rights throughout the country. Defendant also argues that the five-year grace period afforded by the forbearance letters indicates that there was no contract between the parties. In addition, defendant contends plaintiff bore the risk of regulatory change in the State Savings/Citizens Home transaction. With respect to the St. Louis Federal and Lincoln Federal acquisitions, defendant

---

**12.** Defendant's motion to dismiss is not presently before the court because it is not fully briefed. Arguments related to plaintiff's non-contractual claims have been stayed until the court rules on the breach of contract issue.

maintains that any contract between the parties expired when the assistance agreements terminated prior to the enactment of FIR-REA.

Plaintiff argues the three acquisitions in this case are exactly like the mergers in *Winstar*, regardless of the label it assigned the intangible asset. Plaintiff also believes the five-year forbearance period and the termination of the assistance agreements did not preclude the formation of a contract. In addition, plaintiff contends its desire to expand to other states does not prevent it from claiming there was a contract between the parties. In regards to the State Savings/Citizens Home transaction, plaintiff maintains there was no express language in the transactional documents that stated plaintiff assumed the risk of regulatory change.

## I. The *Winstar* Scenario

■ Since this case has been characterized as *Winstar*-related, it is necessary to review the United States Supreme Court's (Supreme Court) decision in that seminal case.[13] Three separate causes of action were heard by the Supreme Court at that time, with *Winstar* serving as the lead case. Glendale Federal Bank, F.S.B. (Glendale) and The Statesman Group, Inc. (Statesman) were the two other thrifts involved. *Winstar*, 518 U.S. at 858, 116 S.Ct. 2432. The court believes the facts of the Statesman and Glendale acquisitions are closely related to the present case.

The Supreme Court described in *Winstar* the facts of the Statesman transaction as follows:

Statesman ... approached FSLIC in 1987 about acquiring a subsidiary of First Federal Savings Bank, an insolvent Florida thrift. FSLIC responded that if Statesman wanted Government assistance in the acquisition it would have to acquire all of First Federated as well as three shaky

thrifts in Iowa. Statesman and FSLIC ultimately agreed on a complex plan for acquiring the four thrifts; the agreement involved application of the purchase method of accounting, a $21 million cash contribution from Statesman to be accompanied by $60 million from FSLIC, and (unlike the Glendale and Winstar plans) treatment of $26 million of FSLIC's contribution as a permanent capital credit to Statesman's regulatory capital.

*Id.* at 866, 116 S.Ct. 2432.

The Statesman transaction included an assistance agreement that contained an "accounting principles" clause. *Id.* It also involved a forbearance letter that recognized a capital credit for part of FSLIC's cash contribution. *Id.* at 867, 116 S.Ct. 2432. FHLBB's resolution pertaining to the Statesman transaction explicitly acknowledged both the capital credits and the creation of supervisory goodwill to be amortized over twenty-five years. *Id.* Based on these attributes, the Supreme Court concluded that "we accept the Federal Circuit's conclusion that 'the government was contractually obligated to recognize the capital credits and the supervisory goodwill generated by the merger as part of the Statesman's regulatory capital requirement and to permit such goodwill to be amortized on a straight line basis over 25 years.'" *Id.* (citing *Winstar Corp. v. United States*, 64 F.3d 1531, 1543 (Fed.Cir.1995)).

In addition, the Glendale transaction also has similarities to the present case. First Federal Savings and Loan Association of Broward County (Broward) approached Glendale in September 1981 about a possible merger. *Id.* at 861, 116 S.Ct. 2432. At the time, Broward had liabilities exceeding its assets by over $734 million. *Id.* Glendale was both profitable and well-capitalized, with a net worth of $277 million. *Id.* After preliminary negotiations, Glendale submitted a

---

13. The court believes it is no longer necessary, however, to set forth a dissertation of the complete circumstances of *Winstar* and its progeny, as this analysis has been explained numerous times by other opinions of this court. *See, e.g., Bluebonnet Sav. Bank, F.S.B. v. United States*, 47 Fed.Cl. 156, 158 (2000). In addition, this court has released numerous opinions on the *Winstar* breach of contract issue in recent months ad-

dressing many of the same arguments. *See, e.g. First Fed'l Sav. Bank of Hegewisch v. United States*, 52 Fed.Cl. 774, 784 (2002); *California Fed'l Bank, F.S.B. v. United States*, 39 Fed.Cl. 753, 762–63 (1997). Since these issues are becoming more settled, it is the court's view that a lengthy analysis on their related arguments is no longer necessary.

merger proposal to FHLBB that "assumed the use of the purchase method of accounting to record supervisory goodwill arising from the transaction, with an amortization period of 40 years." *Id.* FHLBB ratified the merger's "Supervisory Action Agreement" (SAA), on November 19, 1981. *Id.*

The SAA said nothing about supervisory goodwill, but it did contain an integration clause incorporating contemporaneous resolutions and letters, as well as the merger agreement. *Id.* One of the incorporated documents was Resolution 81–710, which referred to two additional documents: (1) a letter from Glendale's accountant identifying the use of goodwill and amortization periods to be recorded in Glendale's books and (2) a stipulation that goodwill would be amortized in accordance with Memorandum 31b. *Id.* Memorandum 31b allowed Glendale to use the purchase method of accounting and to recognize goodwill as an asset subject to amortization. *Id.*

The Supreme Court concluded in *Winstar* that these documents were sufficient to create a contractual relationship between Glendale and the government. The Court commented that "[w]e accordingly have no reason to question the Court of Appeals's conclusion that 'the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes.'" *Id.* at 864, 116 S.Ct. 2432 (quoting *Winstar*, 64 F.3d at 1540); *see also Bluebonnet Sav. Bank, F.S.B. v. United States*, 43 Fed.Cl. 69 (1999).

The three transactions in the present case are virtually identical to the Glendale and Statesman acquisitions. Indeed, all three contained an assistance agreement, merger agreement, and integration clause, which incorporated the corresponding FHLBB reso-

lution. Each assistance agreement also had an "Accounting Principles" provision practically identical to the one in the Statesman contract. In addition, the St. Louis Federal and Lincoln Federal acquisitions involved FHLBB resolutions that explained how the FSLIC cash contributions would be treated as direct capital credits, just like the FHLBB resolution in the Statesman transaction.[14] The requisite documents for the formation of a contract are therefore present in this case.

## II. Branching Rights

### A. *Compared to supervisory goodwill*

█ Defendant concedes that the documents involved in the three transactions at issue are similar to those described in the cases comprising *Winstar*.[15] At oral argument, however, defendant emphasized that it now strongly believes that the issue of branching rights is the key to distinguishing this case from the *Winstar* scenario.[16] Defendant argues that plaintiff's characterization of the intangible asset in this case as branching rights, instead of supervisory goodwill, precludes it from asserting that a contract was formed because *Winstar* only addressed supervisory goodwill. Plaintiff maintains the label attached to the intangible is irrelevant because defendant prohibited its use for capital compliance purposes after FIRREA was enacted, irrespective of what it was called.

It is true that plaintiff referred to the intangible asset in this case as branching rights, at least for GAAP purposes.[17] In contrast, the intangible was denoted as supervisory goodwill in the three transactions considered in *Winstar*, 518 U.S. at 849, 116 S.Ct. 2432. With respect to RAP reporting in the present case, plaintiff recorded the intangible as supervisory goodwill. It appears this designation was not that important, however, because the regulatory report-

---

14. Because the capital credit provisions in the resolutions are basically the same as the one in the Statesman transaction, and since they clearly state that plaintiff could deem them to be a contribution to its net worth, the court finds defendant's attempt to argue that the capital credits were not intended to be included in regulatory capital as unconvincing.

15. Defendant's Memorandum In Opposition To Plaintiff's Motion For Partial Summary Judgment And Cross–Motion For Summary Judgment (Def.'s Mot.) at 20.

16. Tr. at 42.

17. *Id.* at 23.

ing forms simply asked plaintiff to include all intangible assets on the same line item, and did not require them to be identified by a specific title.[18]

Regardless of whether plaintiff referred to the intangible asset in this case as branching rights or supervisory goodwill, defendant allowed plaintiff to use it for regulatory capital compliance purposes prior to the enactment of FIRREA. Under FIRREA's terms, plaintiff was no longer permitted to include the intangible asset in its regulatory capital. This is the same thing that happened in *Winstar*.[19] The court concludes that the label attached to the intangible asset is a distinction that does not materially differentiate this case from the Supreme Court's seminal decision. Indeed, the FHLBB resolutions in the three transactions at issue, which are part of the contract, clearly reference *any* intangible asset.[20] This is in contrast to the contract in the Glendale transaction, which was specifically limited to supervisory goodwill.

### B. *Compared to the right to conduct business in a state*

Defendant also attempts to confuse the intangible asset labeled as branching rights with the actual right to open branch offices in a particular state. In 1986 when the transactions at issue occurred, banking regulations made it difficult for a thrift to open offices in a new state. As part of its agreement with plaintiff to acquire the four failing thrifts at issue, defendant promised it could enter certain additional states to provide services. Thus, defendant gave plaintiff the right to conduct business in these states despite the then existing banking regulations that discouraged such expansion. This right was perceived as an advantage to plaintiff over other thrifts who faced more stringent re-

quirements before opening offices in new states, at that time.[21] In addition to receiving the *actual* right to enter these states, plaintiff chose to label the intangible asset created in the acquisitions as branching rights. Thus, there are two separate rights involved in this case: (1) plaintiff's actual right to enter new states to provide services and (2) branching rights, which was the *label* plaintiff gave to the intangible asset reflecting the excess of the failing thrifts' liabilities over their assets.

Defendant argues that, after FIRREA, plaintiff was not asked to leave the states it had entered to open branch offices. Defendant therefore asserts that there was no breach of contract because the branching rights still had value after FIRREA. This attempt to confuse the intangible known as branching rights with the actual right to enter a state to conduct business is unpersuasive. It is true that plaintiff still had this actual right after the enactment of FIRREA.[22] Plaintiff, however, is not suing for the loss of this right. At issue in this case is the inclusion of the intangible asset for capital compliance purposes. The status of plaintiff's actual right to conduct business in other states is irrelevant for purposes of this litigation.

### III. Defendant's Further Attempts To Distinguish This Case From *Winstar*

Defendant also cites various other circumstances of the present case that distinguish it from *Winstar*. Specifically, defendant argues: (1) plaintiff's interest in branching rights made it entirely rational for plaintiff to acquire the failing thrifts without contractual guarantees; (2) the five-year forbearance periods indicate that there was no contract; (3) plaintiff bore the risk of regulatory change in the State Savings/Citizens Home transaction;

---

**18.** *Id.* at 25; Defendant's Motion To Dismiss And Supplemental Cross Motion For Summary Judgment On Liability, App. at 1574 (FHLBB Quarterly Financial Report (September 1986)).

**19.** The court also believes the fact that plaintiff designated the branching rights to be an identifiable intangible asset, as compared to the supervisory goodwill which is an *un*identifiable intangible asset, does not sufficiently distinguish this case from the *Winstar* scenario. Defendant's

conduct in this case was the same as it was in *Winstar*, regardless of the title given to the intangible asset at issue.

**20.** Pl.'s Mot., App., Ex. 5 at 1126; Ex. 9 at 1547; Ex. 12 at 2057–58.

**21.** Tr. at 51.

**22.** *Id.* at 73.

and (4) any contract between the parties expired when the assistance agreements terminated prior to the enactment of FIRREA.

### A. *The rationality of plaintiff's acquisitions*

Defendant asserts that it was entirely rational for plaintiff to acquire the four failing thrifts in this case without contractual guarantees addressing the treatment of the intangible asset. Defendant emphasizes that plaintiff's goal was to obtain branches across the country in many different states. Since plaintiff was a thriving institution, defendant believes it never expected that it could always include the intangible asset for regulatory capital compliance purposes. Based on these circumstances, defendant maintains there was no contractual relationship between the parties.

Plaintiff argues that defendant is reading *Winstar* to include a "madness" requirement. This means that, in order for there to be a contract, plaintiff would have had to be "mad" to acquire the failing thrifts without contractual guarantees. This argument relies on the assumption that the acquisition of the thrift would be attractive only if such guarantees were in place. Since plaintiff was a strong thrift that wanted to expand across the country, defendant claims plaintiff does not satisfy this "madness" requirement because it would have acquired the thrifts under any circumstances. Plaintiff contends this argument has no merit.

It is true that plaintiff would not have instantly become insolvent if it had acquired the thrifts at issue without the opportunity to record the intangible asset. Plaintiff concedes that it still would have been a viable thrift, at least at the moments of acquisition.[23] Despite defendant's assertions, however, the Supreme Court did not determine in *Winstar* that there was a contract on the sole basis that it would have been irrational for the plaintiffs to acquire the failing thrifts without contractual guarantees. This conclusion did bolster the Supreme Court's holding, at least in respect to the Glendale acquisition. Nevertheless, it was not the dispositive issue in that case. 518 U.S. at 863, 116 S.Ct. 2432.

Notwithstanding plaintiff's goal to expand into other states, plaintiff has established that it would have declined the three transactions at issue without contractual guarantees from the government. Indeed, there were still risks involved in the transaction despite the fact that plaintiff would not have been rendered insolvent by the inability to record the intangible asset. For example, plaintiff's reserves would have been severely depleted, thus adversely affecting its ability to provide loans to its customers. The Supreme Court emphasized in *Winstar* that this leverage to offer loans is an important attribute related to recording the intangible, which in that case was identified as supervisory goodwill. *Id.* at 850, 116 S.Ct. 2432.

Also, defendant was seeking out financially strong institutions to acquire the failing thrifts. Defendant therefore benefitted from plaintiff's financial soundness. The mere fact that plaintiff was a strong thrift prior to the acquisitions should not preclude it from claiming that there was a contract in this case. In addition, plaintiff made it very clear that it wanted to use the purchase method of accounting to record the intangible asset when conducting the mergers. This intent was expressed in the assistance agreements and the FHLBB resolutions. Defendant cannot prove that plaintiff would have agreed to the acquisitions without the promise of recording the intangible. The court finds defendant's argument that plaintiff does not satisfy a "madness" requirement unconvincing.

### B. *Forbearance period*

Defendant also contends that plaintiff was accorded a five-year grace period in each of the transactions that forbore the enforcement of regulatory capital requirements. Defendant maintains these forbearances indicate that no further promise was made to plaintiff regarding the inclusion of the intangible asset for capital compliance purposes. Defendant cites a provision from the State Savings/Citizens Home forbearance letter, in which FHLBB and FSLIC agreed to waive or forbear:

23. *Id.* at 9.

for a period not to exceed five years following consummation of the merger of the *de novo* with First Nationwide ("merger"), from exercising its authority, under Section 563.13 of the Rules and Regulations for Insurance of Accounts, for any failure of First Nationwide, to meet the net worth requirements of Section 565.13.[24]

The FHLBB forbearance letters pertaining to the St. Louis Federal and Lincoln Federal transactions contained very similar net worth forbearances.[25]

Plaintiff asserts this argument fails because the Supreme Court rejected it in *Winstar*. Plaintiff is correct that the forbearance letters issued by FHLBB in the Glendale and Statesman transactions contained similar, if not identical, types of net worth forbearances. Despite these letters, the Supreme Court concluded that both Glendale and Statesman had obtained contractual promises from the government regarding the use of supervisory goodwill and, in the Statesman acquisition, addressing the inclusion of regulatory capital credits. After carefully considering the forbearance letters in this case, the court agrees that they did not prevent plaintiff from contracting with defendant.

### C. *The risk of regulatory change*

■ With respect to the State Savings/Citizens Home acquisition, defendant contends the transactional documents contained risk-shifting language that made it clear that plaintiff understood and agreed the governing legal and accounting principles were subject to change. In the event of a change, defendant believes plaintiff bore the risk of any adverse effects. Specifically, defendant relies on a statement in FHLBB Resolution 86–664 that provides that plaintiff "shall report to the [FHLBB] and the FSLIC, in accordance with generally accepted accounting principles prevailing in the savings and loan industry, *as accepted, modified, clarified, or interpreted by applicable regulations of the [FHLBB] and the FSLIC.*"[26] Defendant argues the changes adopted in FIR-

REA fit within this provision, and thus, defendant cannot be held liable for breach. Plaintiff asserts this language does not mean that it accepted the risk of *subsequent* changes to regulatory policy.

The court believes this phrase in the FHLBB resolution was included to reflect the then current policy regarding the use of purchase method accounting. Indeed, the provision can be read as meaning that GAAP applied, as modified by FHLBB, at that time. It does not serve as a provision that contemplates future changes in regulations and allocates the risk of these changes to plaintiff. Indeed, the language of this phrase is not nearly as explicit as that used in *Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994 (11th Cir.1991), on which defendant relies. In that case, the agreement between the parties revealed they expressly understood that "subsequent amendments to such regulations may be made and that *such amendments may increase or decrease the Acquiror's obligation under this Agreement.*" *Id.* at 999.

In addition, other language in the transactional documents demonstrates that the risk was not assigned to plaintiff. The "Accounting Principles" section of the Assistance Agreement, for example, stated:

§ 13 *Accounting Principles.* Except as otherwise provided herein, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the [FHLBB] or the [FSLIC], or any resolution or action of the [FHLBB] approving, or adopted concurrently with, this Agreement, then this Agreement, such regulations or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations or any such resolution or action. *If there is a conflict be-*

---

24. Def.'s Mot., App. Tab 5 at 899.

25. *Id.,* Tab 6 at 1; Tab 8 at 1.

26. Pl.'s Mot., App., Ex. 5 at 1125–26 (emphasis added).

tween such regulations and the [FHLBB's] resolution or action, the [FHLBB's] resolution or action shall govern. For the purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the [FHLBB] or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either. If there is a conflict between what is required by the FASB and what is required by the [FHLBB], the [FHLBB's] interpretation shall govern.[27]

The emphasized portion makes clear that FHLBB's "resolution or action" would prevail over any conflicting regulations, which are defined in the next sentence to include subsequent regulations. Significantly, the Supreme Court determined in *Winstar* that nearly identical language in the Accounting Principles clauses for the Winstar and Statesman transactions "tilt[ed] in favor of interpreting the contract to lock in the then-current regulatory treatment of supervisory goodwill." 518 U.S. at 865, 116 S.Ct. 2432. For these reasons, the court concludes that plaintiff did not assume the risk of regulatory change in the State Savings/Citizens Home transaction.

### D. *Expiration of the assistance agreements*

Finally, defendant argues that any contractual relationship between the parties in the St. Louis Federal and Lincoln Federal transactions terminated when the assistance agreements expired, which occurred prior to the enactment of FIRREA. As the court recently explained in *Hegewisch*, 52 Fed.Cl. at 784, this specific argument has been rejected by the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims. *See Winstar*, 64 F.3d at 1542; *California Fed'l Bank*, 39 Fed. Cl. at 762–63. There is nothing peculiar about the present case that requires the court to ignore these decisions.

### *Conclusion*

Defendant's attempt to distinguish this case from *Winstar* is therefore unsuccessful.

There was a contractual relationship formed between the parties in all three transactions in this case, pursuant to the merger agreements, assistance agreements, and the documents incorporated by the integration clauses, including the FHLBB resolutions. This contract allowed plaintiff to use the purchase method of accounting to record any intangible asset and to amortize said asset over a period of twenty-five years. It also permitted plaintiff to include this intangible for regulatory capital compliance purposes. Moreover, in the St. Louis Federal and Lincoln Federal transactions, the contracts provided that plaintiff could treat the FSLIC cash contributions as direct credits towards its regulatory capital. Defendant breached these contracts when it enacted FIRREA.

For these reasons, plaintiff's motion for partial summary judgment as to liability, which addresses its breach of contract claims, is GRANTED. Defendant's corresponding cross-motion for summary judgment is DENIED. The parties are directed to file a joint status report addressing further proceedings by Wednesday, August 28, 2002.

IT IS SO ORDERED.

---

**27.** *Id.*, Ex. 4 at 943 (emphasis added).