# United States Court of Appeals for the Federal Circuit

2007-5054

GRANITE MANAGEMENT CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Gregory D. Call, Folger Levin & Kahn LLP, of San Francisco, California, argued for plaintiff-appellant. With him on the brief were Richard Keenan, Michael F. Kelleher, and Julie L. Fieber.

Tarek Sawi, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director. Of counsel on the brier were Kenneth M. Dintzer, Assistant Director, Arlene Pianko Groner, F. Jefferson Hughes, Brian A. Mizoguchi, and Delisa M. Sanchez, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Senior Judge Bohdan A. Futey

# United States Court of Appeals for the Federal Circuit

2007-5054

GRANITE MANAGEMENT CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 95-CV-515, Senior Judge Bohdan A. Futey.

_____

DECIDED: January 8, 2008

_____

Before MAYER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and GAJARSA, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

In the prior appeal in this case, we rejected all but one of the theories of damages that the appellant presented in this breach of government-contract case and remanded to the trial court for further proceedings on that theory. After trial, the court found that the appellant had not proved that remaining theory of damages. We affirm.

I

This appeal in this Winstar related case is a sequel to our decision in Granite Management Corp. v. United States, 416 F.3d 1373 (Fed. Cir. 2005). A savings and

loan association seeks damages from the United States for the latter's breach of a contract permitting the savings and loan to use a particular method of accounting.

During the savings and loan crisis of the late 1970s and early 1980s, to encourage financially-sound savings and loan associations (also known as "thrifts") to acquire financially-troubled thrifts, federal regulators followed the practice of permitting the acquiring thrift to use a fictitious intangible asset called "supervisory goodwill." It "reflected the amount by which the assumed liabilities of the acquired thrifts exceeded the value of the acquired assets. Typically, the acquirers were permitted to include 'supervisory goodwill' in the thrift's reserve capital requirements and to amortize that 'asset' over many years." Granite, 416 F.3d at 1376.

The capital treatment and amortization rights were created under so-called "Assistance Agreements" between the acquiring thrift and the federal government. As we stated in our opinion in the prior appeal, in 1989 Congress

> enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 101 Stat. 183 ("FIRREA"). That Act, among other things, barred the thrifts' use of "supervisory goodwill" as regulatory capital. As a result, many thrifts no longer complied with federal regulatory capital requirements; a number of them became insolvent and were seized by regulatory authorities.
>
> Thrift acquirers filed lawsuits alleging that by enacting and enforcing FIRREA, and thus eliminating use of "supervisory goodwill" as a regulatory asset, the government had breached its contracts with the acquirers. In United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the Supreme Court affirmed this court's en banc determination that FIRREA had that effect, and that the government was liable in damages for breach of contract.

Id. at 1377.

In 1986, the appellant Granite Management Corporation ("Granite") acquired four financially-troubled thrifts, which it combined into a single thrift called First Nationwide Bank ("First Nationwide"). In 1994, in a competitive process, Granite sold First Nationwide, which by then was in good financial condition, to First Madison for more than $1.1 billion.

In the present suit, filed against the United States in the Court of Federal Claims, Granite sought damages for the government's alleged breach of the Assistance Agreements resulting from FIRREA's prohibition of its use of supervisory goodwill. The Court of Federal Claims initially held that the government had breached the Assistance Agreements, but granted the government summary judgment on damages because it rejected all of the damages theories that Granite asserted. Granite Mgmt. Corp. v. United States, 53 Fed. Cl. 228, 241 (2002), 58 Fed. Cl. 766 (2003).

We affirmed all but one of the trial court's rejections of Granite's damages theories. We held that "the Court of Federal Claims improperly granted summary judgment for the government on the claim that the acquirer could have sold the acquired thrifts for a higher price if the thrifts had been allowed to continue treating their 'supervisory goodwill' as regulatory capital. We conclude that further development of the facts on that issue is necessary, and therefore we remand to the Court of Federal Claims for that purpose." Granite, 416 F.3d at 1376.

We pointed out that Mr. Walker, an investment banker who had assisted in the sale of First Nationwide, "testified that he could have structured the sale to preserve the value of the 'supervisory goodwill' had it been available, and that the bank could have been sold for more if such goodwill had been included." Id. at 1383. We stated that on

remand Granite should be allowed to present evidence on at least three specified questions, only one of which we need consider here, namely:

> The parties disagree whether "supervisory goodwill" may be transferred at all. Walker assumed that "supervisory capital could be sold," based on advice he had received from counsel. Apparently there is no definitive answer to that question at this time. Uncertainty over the question would have affected the additional amount a purchaser of the thrifts would have paid if such goodwill were included. This factor must be considered in determining whether the thrift could have been sold for a higher amount if it had included "supervisory goodwill," and, if so, for how much more.

Id. at 1384.

We therefore remanded the case "for further proceedings on" the issue of "whether First Nationwide could have been sold for more if it had included 'supervisory goodwill.'" Id.

After an eleven-day trial, the Court of Federal Claims, in a lengthy opinion that discussed in detail the extensive evidence the parties had submitted, found that Granite had presented "insufficient evidence" to support its claim that First Nationwide could have been sold for more if it had included "supervisory goodwill." It also found that the government had presented "reliable evidence that supervisory goodwill and the Assistance Agreements were not transferable in this case . . . ." Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 164 (2006). The court found that because First Nationwide and its purchaser were both well capitalized and financially healthy, "the transfer of supervisory goodwill from FNB to [its purchaser] would have been completely counter to the purpose of regulatory forebearances, and the regulators, therefore, would have had many reasons to reject the transfer." Id. at 162. Such a transfer would not have fulfilled the basic purpose of permitting supervisory goodwill, namely to "give

realistic incentives to potential acquirers of problem institutions.'" Id. (internal citations omitted).

II

We affirm, as supported by substantial evidence, the Court of Federal Claims' finding that the federal regulators would not have approved the transfer of supervisory goodwill in connection with Granite's sale of First Nationwide. It therefore follows that Granite has not shown that it sustained any injury because the supervisory goodwill was not part of the assets it sold.

A. The Assistance Agreements involved in this case each provided:

> All the terms and provisions of this agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned by any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

Id. at 160.

Granite contends that because the consent provision was executory, it did not survive the termination of the Assistance Agreements that FIRREA caused, and that when it sold First Nationwide, it therefore was not required to obtained the regulators' 'written consent for the transfer of supervisory goodwill.

We do not so read the provision. The first clause is a typical "transferees, successors, and assignees" provision. It, however, is limited by the immediately following language that "any rights or obligations" under the agreement may not be "transferred" "without the prior written consent" of the regulators. The two clauses are part of an integrated whole. The assurance that Granite's rights under the agreements

would "inure to the benefit of" its "transferees, successors, and assigns" also is subject to the condition that Granite could not transfer those rights without the consent of the regulators.

These two integral parts of the provision cannot be split, as Granite seeks to do, between the availability of the contractual provisions to Granite's transferees and the requirement of prior regulatory approval of the transfers. As the trial court stated, "[t]he assignment clause is thus an all-or-nothing proposition, either the entire assignment provision remained in effect after the expiration of the Assistance Agreement or it did not." Id. at 161.

It therefore follows that if the regulators would not have consented to Granite's transfer of the supervisory goodwill when it sold First Nationwide, Granite could not have obtained a higher price for First Nationwide if the sale had included supervisory goodwill. Stated differently, if Granite were unable to transfer the supervisory goodwill, no one would be willing to pay anything additional for it. Because we uphold the trial court's finding that the regulators would not have allowed the transfer of supervisory goodwill on the sale of First Nationwide, that results in affirmance of the trial court, and we need not consider the other grounds on which that court also based its decision.

B. The "supervisory goodwill" involved here was a fictitious asset created to encourage and facilitate financially-sound thrifts to acquire financially-distressed ones. It was not true goodwill, which represents the excess of a business' going-concern value over the value of its assets. See Winstar, 518 U.S. at 848-49 (Opinion of Justice Souter). Here, as noted, it represented the converse, i.e., the excess of the amount paid for a business' assets over the value of those assets. It was designed not to reflect

the true worth of the business but to encourage sound thrifts to acquire financially-distressed ones by creating fictitious assets they could use to satisfy regulatory capital requirements and permit substantial depreciation. As the trial court stated: "Supervisory goodwill is not a tangible asset, but an accounting fiction. It is a means of substituting an agreement with regulators for real assets in the calculation of regulatory capital." Granite, 74 Fed. Cl. at 160 (internal citations and quotation marks omitted).

None of the considerations that led to and informed the regulators' adoption of the "supervisory goodwill" concept were applicable to Granite's sale of First Nationwide. By the time of that transaction, First Nationwide was a well capitalized and financially-sound institution. There was no need to provide financial incentives to induce successful thrifts to acquire it, or any compelling federal interest in favor of such acquisition. Accordingly, as the Court of Federal Claims stated, the transfer of Granite's "supervisory goodwill" "would have been completely counter to the purpose of regulatory forbearances" (a shorthand description of the treatment of supervisory goodwill). Id. at 162. The record supports that court's finding that the regulators would have had no reason to approve, and would not have approved, the transfer of supervisory goodwill as part of Granite's sale of First Nationwide to First Madison.

Granite argues that the trial court's conclusion that the regulators would not have approved the transfer of supervisory goodwill here was refuted by evidence that, in fact, they had approved other such transfers. We conclude that the record does not show any significant regulatory approval of pre-FIRREA supervisory goodwill transfers.

Before the trial court, Granite presented studies by its expert, Professor James, of pre-FIRREA thrift transfers in which the regulators allegedly approved the transfer of

supervisory goodwill. Professor James relied on four instances of such transfers, the applicability of which to the present case the trial court described as "questionable." Id. at 162. The court noted that three of the transactions involved a different method of accounting than the present case. Id. The court further pointed out that the amount of supervisory goodwill allegedly transferred was uncertain "because pre-FIRREA, supervisory goodwill was not identified separately from goodwill." Id. at 163. The court concluded that "Professor James' attempt at presenting actual factual evidence of pre-FIRREA transfers of goodwill simply is not reliable." Id.

The trial court noted other examples in the record that contradicted Professor James' claim. It stated that pre-FIRREA, First Nationwide twice sold thrift entities and in each sale eliminated from its books a significant amount of goodwill. Id. Finally, two government regulators, who functioned pre-FIRREA, testified that they had never heard "of a request to transfer supervisory goodwill or Assistance Agreements during their tenures." Granite, 74 Fed. Cl. at 163 (footnote omitted). The trial court concluded that "[i]t seems highly unlikely, therefore, that two high ranking regulators would have no knowledge of an Assistance Agreement being included in a sale if it had ever happened." Id.

Finally, Granite repeats the argument it made in the prior appeal that it is not plausible that the value of its supervisory goodwill was zero. As we stated in our opinion there, "[t]he trial court, however, did not hold that the government's breach of contract caused Granite no damage, but held only the far different point that Granite had failed to prove its damages." Granite, 416 F.3d at 1383. The same conclusion applies here.

As Mr. Justice Jackson, speaking for the Court in <u>United States v. Yellow Cab Co.</u>, 338 U.S. 338, 340-341 (1949), stated, in words equally applicable to the present case:

> The judgment below is supported by an opinion, prepared with obvious care, which analyzes the evidence and shows reasons for the findings. To us it appears to represent the considered judgment of an able trial judge, after patient hearing, that . . . [Granite's] evidence fell short of its allegations — a not uncommon form of litigation casualty, from which [Granite] is no more immune than others.

## CONCLUSION

The judgment of the Court of Federal Claims is

<u>AFFIRMED</u>.