GRANITE MANAGEMENT
CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–515C.

United States Court of Federal Claims.

Dec. 6, 2006.

Richard Keenan, San Francisco, California, attorney of record for plaintiff, Granite Management Corporation, and Gregory D. Call, Michael F. Kelleher, Julie L. Fieber, Charles J. Cooper, Michael W. Kirk, and David H. Thompson, of counsel.

Tarek Sawi, Department of Justice, Washington, D.C., with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, William F. Ryan, Assistant Director, Arlene Pianko Groner, F. Jefferson Hughes, Brian A. Mizoguchi, and Delisa M. Sanchez, of counsel.

### OPINION & ORDER

FUTEY, Judge.

This *Winstar*-related case comes before the court on damages following a remand from the United States Court of Appeals for the Federal Circuit (Federal Circuit). After finding that the government had entered into binding contracts with plaintiff and subsequently breached those contracts through the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), *Granite Mgmt. Corp. v. United States*, 53 Fed.Cl. 228 (2002) *(Granite I)*, this court rejected plaintiff's damages theories on summary judgment and declined to award plaintiff any damages. *Granite Mgmt. Corp. v. United States*, 58 Fed.Cl. 766 (2003) *(Granite II)*. With the exception of one count, the "lost value on sale" damages theory, the Federal Circuit affirmed this court's holding in all respects. *Granite Mgmt. Corp. v. United States*, 416 F.3d 1373 (Fed.Cir. 2005) *(Granite III)*. The Federal Circuit reasoned that this model created a genuine issue of material fact and remanded the case to this court for further factual development. *Id.* at 1384.

The Federal Circuit remanded the case to this court on the following three questions:

1. What is the factual basis for Walker's conclusion that First Nationwide could have been sold for a higher price if it had included the "supervisory goodwill?" Have there been any sales of thrifts that included such goodwill? If so, did they sell for a higher price than thrifts without such goodwill?

2. Does Walker have any actual factual basis for determining the alleged higher amount for which First Nationwide could have been sold if it had included "supervisory goodwill"? How much additional value could the thrift have brought if the goodwill was included in the deal? What is the basis for that calculation?

3. The parties disagree whether "supervisory goodwill" may be transferred at all. Walker assumed that "supervisory capital could be sold," based on advice he had received from counsel. Apparently there is no definitive answer to that question at this time. Uncertainty over the question would have affected the additional amount a purchaser of the thrifts would have paid if such goodwill were included. This factor must be considered in determining whether the thrift could have been sold for a

higher amount if it had included "supervisory goodwill," and, if so, for how much more.

*Granite III*, 416 F.3d at 1383–84.

This court held an eleven day trial in order to determine the answers to these questions.

### Factual Background

As this case is a *Winstar*-related case, it is unnecessary to revisit the history of the savings and loan crisis. This has been done extensively in prior opinions of the United States Supreme Court, the Federal Circuit, and this court. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 843–56, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Bluebonnet Sav. Bank, FSB v. United States*, 47 Fed.Cl. 156, 158 (2000), *rev'd in part*, 266 F.3d 1348, 1354–55 (Fed.Cir.2001). Extensive background facts were set forth in the court's opinions on liability and summary judgment and will not be repeated in detail here. *See Granite II*, 58 Fed.Cl. 766 (2003); *Granite I*, 53 Fed.Cl. at 228 (2002).[1]

In 1986, plaintiff, Granite Management Corporation, acquired the thrifts that form the basis of this suit.[2] Plaintiff acquired State Savings & Loan Company of South Euclid, Ohio, and Citizens Home Savings Company of Lorain, Ohio, on June 27th (Ohio transaction). On December 22nd, plaintiff acquired St. Louis Federal Savings & Loan Association of St. Louis, Missouri (Missouri transaction). On December 29th, plaintiff acquired Lincoln Federal Savings & Loan of Louisville, Kentucky (Kentucky transaction). Pursuant to the Assistance Agreements in the Missouri transaction and the Kentucky transaction, the government made cash contributions of $75,000,000 and $93,000,000, respectively. Further, as a result of the three

transactions, the following intangible assets were recorded: 1) Ohio transaction: $50,648,834; 2) Missouri transaction: $100,412,000; 3) Kentucky transaction: $35,404,000. The total amount of the intangible assets equaled $186,464,834.[3] The Assistance Agreements for all three transactions also allowed plaintiff to use the cash contributions (a.k.a. "capital credits") and the goodwill,[4] a total of $354,464,834 to be amortized on a straight line basis over twenty five years, to meet regulatory capital requirements.

The year 1989 bears particular significance in *Winstar*-related cases. On August 9th of that year, FIRREA was enacted. FIRREA and its implementing regulations changed the capital requirements applicable to thrifts, imposing core capital, tangible capital, and risk-based capital requirements. Specifically, FIRREA provided, in pertinent part, that supervisory goodwill could not be counted toward tangible capital, and that the role of supervisory goodwill in meeting core and risk-based capital requirements would be greatly diminished. FIRREA also required that the remaining amounts be phased-out within a five-year time frame. Plaintiff's unamortized balance of supervisory goodwill that existed at the end of 1989 was $273,039,000.

In December 1990, Ford Motor Company (Ford), plaintiff's parent company, infused $250,000,000 in capital into the holding company, which in turn infused the money into First Nationwide Bank (FNB).[5] Evidence presented at trial demonstrated that this action was taken in order to satisfy the regulators' demands that FNB strengthen the capital ratios that had been reduced as a result of FIRREA.[6] FNB also took a num-

---

1. The following recitation of facts is taken largely from this court's opinion in *Granite II* along with additional facts presented at trial.

2. Up until September 30, 1994, plaintiff was known as First Nationwide Financial Corporation (FNFC).

3. *Pl.'s Exs. 13, 20, 21.*

4. At trial, plaintiff referred to the combination of cash contributions/capital credits and supervisory goodwill as "Supervisory Capital." The court,

however, will refer to both as supervisory goodwill for the purposes of this opinion.

5. FNB was renamed Granite Savings Bank (GSB) in September 1994, and, consequently, GSB merged into plaintiff on June 30, 1995.

6. In its response to defendant's motion for summary judgment and the ensuing appeal before the Federal Circuit, plaintiff claimed that the regulators required the capital infusion from Ford and also averred that the regulators would not allow it to issue subordinated debt. *See*

ber of steps to improve its overall capital position at this time including selling "off enormous amounts of loans, somewhere in the order of magnitude of 5 to 10 billion dollars worth of loans, many of them good loans that [ ] reduce[d] [plaintiff's] asset base and, therefore, increase[d] [the] capital ratios." [7] Plaintiff also "restructured the bank by moving what were considered to be problem assets [real estate development assets and troubled commercial loans] out of the bank and into Ford." [8] By 1993, FNB had been significantly restructured and was a healthy institution.

In late 1991 or early 1992, Ford sought the assistance of Joseph Walker, head of J.P. Morgan's Mergers and Acquisitions Group, in exploring Ford's options with regard to FNB. After an exhaustive study of FNB's operations and the value of its assets, Ford decided that the best course of action would be to sell FNB and asked Mr. Walker to handle the sale. Among Mr. Walker's responsibilities were valuing FNB as a going concern, locating interested bidders, and negotiating with those bidders. Senior Management from FNB and Ford took a "hands-on" approach, and worked along-side Mr. Walker and his team during negotiations. Following an extensive screening process, three prospective purchasers, First Madison, Great Western, and World Savings, were invited to participate in final negotiations, which occurred in March and April 1994. The parties' final bids were submitted in April 1994. Shortly thereafter, Ford's Board of Directors chose First Madison as the winning bid.

On August 7, 1995, plaintiff filed suit in this court. Following a series of motions and briefs, the case was transferred to the undersigned judge on February 1, 2002. The court stayed all non-contractual claims until the breach of contract issue was resolved. In an opinion dated August 7, 2002, *Granite*

*I*, 53 Fed.Cl. 228, the court held that a contractual relationship existed in all three transactions. In particular, the court found that the contracts permitted plaintiff to use the purchase method of accounting, to amortize the assets created by the contract over a twenty-five year period, and to count said assets for regulatory compliance purposes. The court also held that the contracts underlying the Missouri transaction and the Kentucky transaction allowed plaintiff to treat the cash contributions as direct credits toward its regulatory capital. Lastly, the court held that defendant's enactment of FIRREA breached these contracts.

On December 16, 2003, this court issued an opinion denying plaintiff's damages claims, rejecting all of plaintiff's damage theories of restitution, reliance, lost value on sale, and cost of replacement capital. *Granite II,* 58 Fed.Cl. 766. The Federal Circuit affirmed this decision in part in an opinion dated July 27, 2005, remanding the case solely on the lost value on sale claim.

*Discussion*

Plaintiff attempted to present evidence at trial to support two different methods of calculating how much more FNB could have sold for if it was able to include supervisory goodwill in the sale to First Madison. The theory and calculations were demonstrated at trial by Mr. Walker and supported by the testimony of Professor Christopher James. Mr. Walker submitted two models for damages—his "leverage model" and his "dividend model."

The "leverage model" rests on the hypothesis that supervisory goodwill would have allowed a purchaser to leverage additional assets and thereby incrementally increase cash flow. In other words, plaintiff argues that a purchaser would view supervisory goodwill as valuable to the thrift because it

---

*Granite III*, 416 F.3d at 1377; *Granite II*, 58 Fed.Cl. at 769. Conversely, defendant asserted in its motion for summary judgment that the real estate recession in California, and lack of income from its real estate development business, were factors unrelated to FIRREA which caused Ford to infuse the capital. *Granite II*, 58 Fed.Cl. at 769. Defendant also maintained that contrary to plaintiff's assertion, "[t]he regulators did not

simply prefer capital, but were statutorily constrained from recognizing subordinated debt as capital." *Id.*

**7.** *Trial Transcript ("Tr.") at 1253–54*, Testimony of Joseph Mahoney.

**8.** *Tr. at 1254.*

would allow the purchaser to invest more assets and the returns from these additional investments would increase profits. According to Mr. Walker, in the investment banking world the buyer and/or seller would calculate the current value of these future profits by using a discounted cash flow, just as Mr. Walker did for the assets included in FNB's real world sale to First Madison.

A discounted cash flow analysis involves "(1) estimating the cash flow that may be realized from the buyer's investment in the target over time; (2) setting the period of the future cash flow; and (3) discounting those projected returns to a present value. This step requires the selection of a number to reflect the time value of money and an estimate of the risk factor." AARON RACHELSON, CORPORATE ACQUISITIONS, MERGERS AND DIVESTITURES § 1:139 (2006). In order to estimate the potential cash flow of the supervisory goodwill, Mr. Walker's first step was to decide "the amount of assets that could be supported by Supervisory Capital,"[9] also known as a "leverage ratio." By looking at the overall leverage ratios of FNB and potential buyers of FNB, Mr. Walker chose a leverage ratio for his analysis of six percent.[10] Essentially, according to Mr. Walker, every six cents of supervisory goodwill could support a dollar of assets. Therefore, at the time of the sale, absent the breach, FNB would have had $213,835,000 of supervisory goodwill which would have supported $3,350,082,000 in additional assets.[11] Mr. Walker repeated this process for every year between 1994 and 2011, amortizing the goodwill on a straight line basis as required by the Assistance Agreements.[12]

Mr. Walker's next step in calculating the potential cash flow was to determine the likely rate of return on the additional assets supervisory goodwill would have been able to support. Mr. Walker chose a rate of return

of .74% after taxes, based on the descriptive memorandum of FNB that J.P. Morgan prepared for the sale.[13] Next, Mr. Walker reduced the potential profits for each year by thirteen percent in order to take into account the cost of capital, again using the same rate he used in the actual sale of FNB.[14] He then discounted this amount to calculate the present value of that money, taking into account the cost of capital, the risk involved in investing, and the time value of money. Mr. Walker used a discount rate of thirteen percent (after taxes, 21.67% before taxes), again taken from his actual projections when he valued FNB for sale. Accordingly, Mr. Walker calculated that FNB could have sold for an additional $136,521,000 absent the breach.[15]

Mr. Walker also presented an alternative theory, the "dividend model." This assumes that First Madison would have made a dividend payment to itself of $213,835,000, the amount equal to the face value of the supervisory goodwill at the time of the sale. Mr. Walker discounted the $213,835,000 to account for the fact that as the supervisory goodwill amortized, capital would have to be reinvested into the thrift. Mr. Walker further reduced this amount to compensate for the cost of raising the necessary capital. Using this method, Mr. Walker found that FNB's supervisory goodwill would have increased the sale price by $130,744,000.

## A. Transferability

As stated above, the Federal Circuit remanded this case to the court on three matters. The third question posed by the Federal Circuit was:

The parties disagree whether "supervisory goodwill" may be transferred at all. Walker assumed that "supervisory capital could be sold," based on advice he had received from counsel. Apparently there is no de-

---

9. *Pl.'s Ex. 159 at 10*

10. *Id.*

11. *See Pl.'s Ex. 159, Ex. 4.*

12. *Id.*

13. Mr. Walker also examined materials from First Madison, which expected a return on FNB's assets of 1.08%, *Pl.'s Ex. 159, Ex. 7,* as

well the rates of returns of other financial institutions that were approximately the same size as FNB. *Pl.'s Ex. 159, Ex. 8.*

14. *See Pl.'s Ex. 159 at 11.*

15. *See Pl.'s Ex. 159, Ex. 4.*

finitive answer to that question at this time. Uncertainty over the question would have affected the additional amount a purchaser of the thrifts would have paid if such goodwill were included. This factor must be considered in determining whether the thrift could have been sold for a higher amount if it had included "supervisory goodwill," and, if so, for how much more.

*Granite III*, 416 F.3d at 1384. Although the Federal Circuit asked this question last, we consider it a threshold issue. If supervisory goodwill could not have been transferred, then it would have no value under either of Mr. Walker's theories.

Plaintiff argues that supervisory goodwill was a contract right granted by the government in the Assistance Agreements. Each of the three Assistance Agreements reads

All the terms and provisions of this agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned by any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.[16]

Plaintiff avers that this clause gave it the power to transfer its rights to use the supervisory goodwill created by the agreements for regulatory purposes. Defendant, on the other hand, maintains that plaintiff could not have transferred the supervisory goodwill contained in the agreements because goodwill is not transferable.

Defendant presented a great deal of evidence on how goodwill is accounted for and created under typical circumstances. Goodwill is an unidentifiable intangible asset that is "the excess of the purchase price over the fair value of all identifiable assets." *Winstar*, 518 U.S. at 848–49, 116 S.Ct. 2432. Under Generally Accepted Accounting Principles (GAAP) rules for purchase accounting, with each successive acquisition of a corporation, a new amount of goodwill is created.

For example, if Company A has identifiable net assets of one million dollars and is sold to Company B for two million dollars, the amount of goodwill recorded on Company B's financial records is one million. If, sometime later, Company B, which now has five million in identifiable net assets, is sold to Company C for seven million, Company C will record two million dollars of goodwill on its books. This new goodwill is not related to the goodwill created in the sale of Company A to Company B. As First Madison's attorney stated when examining the purchase of FNB "any newly created goodwill cannot be directly correlated to the goodwill included in the historical financial statements of [FNB]."[17] Defendant argues that because goodwill is, therefore, not sold or transferred under GAAP, supervisory goodwill also may not be transferred.

Although defendant is correct that goodwill is not a saleable asset, this misses the point. "[T]he accounting treatment to be accorded supervisory goodwill and capital credits was the subject of express arrangements between the regulators and the acquiring institutions." *Winstar*, 518 U.S. at 853, 116 S.Ct. 2432. "[S]upervisory goodwill is not a tangible asset, but an accounting fiction. It is a means of substituting an agreement with regulators for real assets in the calculation of regulatory capital." *Commercial Fed. Bank v. United States*, 59 Fed. Cl. 338, 351–52 (2004). The ability to use this "means of substituting" was a contract right granted by the government and is not effected by GAAP even though it is wrapped up in accounting principles. Instead of focusing on the transferability of goodwill as the government did, the court must look at whether there is a factual basis that the Assistance Agreements and the right to use supervisory goodwill to meet regulatory requirements under those agreements could have been transferred in FNB's sale to First Madison.

As stated above, each of the Assistance Agreements contained an assignment clause, but any transfer required the approval of the

16. *Pl.'s Exs. 12, 16, 19.*

17. *Def.'s Ex. 416 at GM 4003 1944.*

regulators. Plaintiff asserts that because the consent clause of the assignment section above was executory, it was not in effect when plaintiff sold FNB.[18] Alternatively, plaintiff argues that there is no evidence that consent would have been withheld. Defendant, on the other hand, argues that the regulators' consent was necessary to transfer supervisory goodwill and that this permission would not have been forthcoming.

Plaintiff's assertion that the consent provision of the assignment clause was no longer in effect at the time of FNB's sale to First Madison is simply incorrect. Plaintiff cites a single case for this assertion, *First Federal Savings Bank of Hegewisch v. United States*, 52 Fed.Cl. 774 (2002), which merely states that the contractual relationship in that case "did not end with the termination of the Assistance Agreement." *Id.* at 784. Although it is true that the Federal Circuit has found the "expiration provision [of an Assistance Agreement] as only relating to executory provisions set out in the [Assistance Agreement] ...," plaintiff's interpretation that only the consent provision was executory is wrong. *Winstar Corp. v. United States*, 64 F.3d 1531, 1542 (Fed.Cir.1995).

An "executory provision" is one which is "to be performed at a future time; yet to be completed." BLACK'S LAW DICTIONARY 611 (8TH ED.2004). It is illogical to argue, therefore, that the ability to assign was not executory while the power to consent was—both an assignment and the consent would have had to take place at some time after the contract took effect. The assignment clause is thus an all-or-nothing proposition, either the entire assignment provision remained in effect after the expiration of the Assistance Agreement[19] or it did not. If there was no assignment clause in effect, the contract was not assignable under the Anti–Assignment Act, 41 U.S.C. § 15, which states that any contract with the United States can not be assigned absent a waiver. *See* 41 U.S.C. § 15(a) ("No contract ... shall be transferred by the party to whom such contract ... is given to any other party, and any such

transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned.") Because neither party addressed the applicability of 41 U.S.C. § 15 to this case, however, the court will assume the assignment clauses of all of the Assistance Agreements remained in effect after the expiration of the agreements.

■ Plaintiff and defendant disagree as to whether the regulators would have approved the transfer of goodwill. Under the doctrine of good faith and fair dealing, the regulators could not have withheld consent unreasonably. "The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed.Cir.2005) (citing RESTATEMENT (SECOND) OF CONTRACTS, § 205 (1981); 13 Richard A. Lord, WILLISTON ON CONTRACTS § 38:15, at 437–38 (2000)) (other citations omitted). "The duty applies to the government just as it does to private parties." *Id.* (citing *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1330 (Fed.Cir.2003); *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed.Cir.2000); *Malone v. United States*, 849 F.2d 1441, 1445, *modified*, 857 F.2d 787 (Fed.Cir.1988)); *see also Pacific Far East Line, Inc. v. United States*, 184 Ct.Cl. 169, 394 F.2d 990 (1968) (holding that "the same rules of law that govern private individuals" apply to the government when it enters into a contract.) *See also Hughes Transp. v. United States*, 128 Ct.Cl. 221, 121 F.Supp. 212, 228 (1954). "A party vested with contractual discretion must exercise his discretion reasonably and may not do so capriciously." *Pacific Far East*, 394 F.2d at 998 (citations omitted).

■ Plaintiff alleges that defendant presented no evidence at trial that the regu-

---

18. Defendant argues that the court should not consider this argument because it was first raised at trial and was not presented to the Federal Circuit during plaintiff's previous appeal.

19. Each of the three Assignment Agreements expired prior to the sale of FNB.

lators would not have approved the transfer of the unamortized portion of FNB's supervisory goodwill to First Madison. Moreover, plaintiff argues that the regulators would have approved the transaction because in real life, there were no objections to the merger on safety and soundness grounds. Defendant, however, did present evidence that the conveyance of supervisory goodwill to First Madison would not have been approved, not on safety and soundness grounds, but because First Madison did not need supervisory goodwill and the transfer would, therefore, have unnecessarily increased First Madison's risk. "The basic purpose in granting forebearances [was] to give realistic incentives to potential acquirers of problem institutions."[20] Furthermore, the Federal Home Loan Bank Board (FHLBB) limited the forebearance incentives "to those actually necessary for an acquirer to complete a supervisory merger or acquisition."[21] In 1994, when First Madison purchased FNB, both institutions were well-capitalized and healthy. Clearly, the transfer of supervisory goodwill from FNB to First Madison would have been completely counter to the purpose of regulatory forebearances, and the regulators, therefore, would have had many reasons to reject the transfer.

Plaintiff attempted to provide evidence that supervisory goodwill was transferred when thrifts merged pre-FIRREA. Professor James presented at trial the results of his "detective work"[22] which examined certain mergers prior to 1989 to deduce whether supervisory goodwill survived these transactions. Because supervisory goodwill was not differentiated from regular goodwill until after FIRREA was passed, Professor James could not rely simply on financial statements or Thrift Financial Reports (TFR) to determine whether supervisory goodwill was ever transferred. Instead, Professor James undertook a three part inquiry to find transactions that may have included supervisory goodwill. First, he identified mergers that took place in 1982 or 1983, when many supervisory acquisitions occurred, that likely included regulatory forebearances. Next, Professor James pulled out those institutions that were the subject of a later pre-FIRREA merger. Finally, he examined the institutions that remained in existence post-FIRREA and reviewed their TFRs because after the passage of FIRREA the unamortized portion of the goodwill should have appeared on these reports. Thus, Professor James argued that he could thereby identify if supervisory goodwill had survived from the original transaction in 1982 or 1983 to the post-FIRREA time period.

After sifting through the data, Professor James found four examples[23] to support plaintiff's contention that supervisory goodwill was transferrable and had been included as an asset in pre-FIRREA thrift acquisitions. The applicability of these four examples to the case at hand is questionable. First, three of the four transactions described by Professor James employed the pooling method of accounting, which was used when two businesses combined and, therefore, added the assets of the two corporations together without any adjustments.[24] First Madison's purchase of FNB was not eligible for the pooling method of accounting, therefore making the structure of the transaction and accounting of the goodwill very different from those three examples.[25] Second, Professor James only had direct evidence of the amount of supervisory goodwill granted by an agreement in one of his examples because of his personal involvement with that case. For the other three examples, Professor James could only look at the

20. *Def.'s Ex. 15 at 2.*

21. *Id.*

22. *Tr. at 891.*

23. The institutions presented as examples were the acquisition of First Federal of Jacksonville by Southeast Banking Corp., the acquisition of First Federal of Minneapolis by Minnesota Federal, the acquisition of Ultra Bancorp and Apollo S & L by Mid Am, and the acquisition of Carteret by AmBase. *See Pl.'s Exs. 610–613.*

24. *See. Pl.'s Ex. 1 at 209.* In this context, a business combination means two corporations joining together to form a new corporation as opposed to an acquisition or merger whereby one corporation purchases another. *Id at 207.*

25. *Tr. at 766–767.*

amount of goodwill generally reported by the corporations in the pre-FIRREA period because pre-FIRREA, supervisory goodwill was not identified separately from goodwill. It is therefore mere guessing to state how much, if any, supervisory goodwill transferred in these three examples. Finally, the amount of goodwill reported from transaction to transaction is totally irregular. In nearly every example, the amount of goodwill listed decreases where it should increase if Professor James' theory holds. In all, Professor James' attempt at presenting actual factual evidence of pre-FIRREA transfers of goodwill simply is not reliable.

Perhaps a better example to look at is FNB itself and its pre-FIRREA transactions. In 1987, plaintiff sold off the subsidiary it acquired as part of the Kentucky Transaction, known as "UMA". As a result, FNB took approximately $13,000,000 of goodwill off its books. Plaintiff did not present evidence that the "contract rights" granted in the Kentucky transaction were sold in whole or part to the buyer of the subsidiary or that FNB sought regulatory approval to assign the Assistance Agreement to the buyer. Furthermore, by "writing off" the $13,000,000, FNB could no longer use this goodwill for regulatory purposes. In 1989, plaintiff again sold off certain branches associated with the Kentucky transaction and again wrote off $3.9 million of goodwill. As before, there is no record that contract rights were transferred and the $3.9 million was taken off FNB's books so that it could no longer be used for regulatory purposes. These two sales are certainly more concrete evidence that supervisory goodwill did not transfer as "contract rights" pre-FIRREA and that supervisory goodwill must be written off the seller's books in the same manner as ordinary goodwill. Supervisory goodwill, therefore, is not included as an asset in a sale.

The only other solid evidence regarding whether goodwill was transferred pre-FIRREA was the testimony of David Martens and Alvin Smuzynski. Both of these witnesses were employed by the FHLBB pre-FIRREA. Neither witness remembered ever hearing of a request to transfer supervisory goodwill or Assistance Agreements during their tenures.[26] Professor James examined over 100 mergers between 1983 and 1988, forty-one in 1987–1988 alone. Clearly, there was a lot of activity in these years. It seems highly unlikely, therefore, that two high ranking regulators would have no knowledge of an Assistance Agreement being included in a sale if it had ever happened.

The only other evidence plaintiff provided that the supervisory goodwill would have transferred was Mr. Walker's testimony that he would have included goodwill as an asset when valuing and selling FNB. Mr. Walker testified that because he would have listed supervisory goodwill as an asset, the buyer would have had to purchase it as a part of a going concern. Essentially, this is a circular argument—because Mr. Walker believed supervisory goodwill had value, it was transferable, and because supervisory goodwill was transferable, it had value.[27] Not only is Mr. Walker's testimony unconvincing, it is not evidence of transferability, as required by the Federal Circuit, but merely an argument. In fact, just as he did at the summary judgment stage, Mr. Walker assumed, based on counsel's advice, that supervisory goodwill was transferable.[28]

Finally, plaintiff did not address a portion of the Federal Circuit's third question at all. The Federal Circuit stated "[u]ncertainty over the question would have affected the additional amount a purchaser of the thrifts would have paid if such goodwill were included." *Granite III*, 416 F.3d at 1384. Mr. Walker disagreed with this statement and, therefore, did not adjust his theories or valuation at all to deal with this issue. Although

---

26. *Tr. at 1452–56, 3021–25.*

27. Mr. Walker's argument is not particularly convincing from a factual standpoint because FNB moved certain assets that First Madison was not interested in buying, either because they were troubled assets or for some other reason, out of the thrift prior to the sale. Therefore, it is

apparent that merely because FNB had an asset for sale, First Madison was not necessarily interested in buying that asset.

28. *Compare Tr. 125–26 with Granite II*, 58 Fed. Cl. at 780.

the Federal Circuit is free to revise its findings, this court must follow the instructions it received. Therefore, plaintiff presented insufficient evidence on all aspects of the Federal Circuit's third question. Because defendant presented reliable evidence that supervisory goodwill and the Assistance Agreements were not transferable in this case, we hold that, even absent a breach, plaintiff could not have included supervisory goodwill as an asset in the sale of FNB to First Madison. Hence, no value was lost on the sale and plaintiff suffered no damages.

## B. Value

The court finds that plaintiff could not have transferred its right to use supervisory goodwill absent a breach. Nevertheless, we will examine the remaining questions posed by the Federal Circuit. The next issue remanded to this court is:

What is the factual basis for Walker's conclusion that First Nationwide could have been sold for a higher price if it had included the "supervisory goodwill?" Have there been any sales of thrifts that included such goodwill? If so, did they sell for a higher price than thrifts without such goodwill?

*Granite III*, 416 F.3d at 1383.

Plaintiff argues that supervisory goodwill had value to potential acquirers, including First Madison, because supervisory goodwill could "generate cash flows, and buyers would value that opportunity." [29] Plaintiff bases its claim on the facts that supervisory goodwill lowered costly capital requirements and the government marketed supervisory goodwill as having value. In addition, plaintiff avers that pre–FIRREA transactions demonstrate that thrifts with supervisory goodwill sold for higher prices than those without.

Defendant contends that a buyer would not have paid cash for FNB's goodwill. To support its argument, defendant claims that there were insufficient investment opportunities, making the ability to increase leverage valueless. Moreover, defendant avers that the pre-FIRREA transactions do not show that thrifts with supervisory goodwill sold for more than those without, and the data used by plaintiff actually points to the opposite conclusion.

Plaintiff's contention that potential buyers of FNB would have viewed supervisory goodwill as valuable and, therefore, paid more for the thrift is not supported by the evidence presented at trial. Plaintiff attempted to lay a foundation that supervisory goodwill is *always* valuable by quoting primarily from two sources. First, plaintiff repeatedly displayed a document entitled "Purchasing an Insolvent Savings Institution through the Federal Savings & Loan Insurance Corporation" [30] which was distributed to corporations potentially interested in acquiring troubled thrifts. In particular, plaintiff highlighted a portion of the section "More Lenient Capital Requirements" which states that an advantage of a thrift over a bank was that the regulatory forebearances allowed "potential investors [to] enjoy greater leverage in their investment." [31] Second, plaintiff often quoted the Supreme Court in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) stating "[f]rom the acquiring thrift's perspective, however, the treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits.)" *Winstar*, 518 U.S. at 850–51, 116 S.Ct. 2432.

Plaintiff, however, took these statements, in large part, out of context. The "More Lenient Capital Requirements" also states "in a FSLIC assisted acquisition forebearances may be granted on the regulatory capital requirements. The forebearances aid in reducing the acquirors [sic] risk, as well as giving the acquiror an *incentive* to return the troubled institution to a viable status within a reasonable time frame." [32] The Supreme Court found that "[b]ecause FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets,

---

**29.** *Pl.'s Post–Trial Brief at 19.*

**30.** *Pl.'s Ex. 195.*

**31.** *Id. at 3.*

**32.** *Id.* (emphasis added).

the Bank Board had to offer a 'cash substitute' to *induce* a healthy thrift to assume a failed thrift's obligations." *Id.* at 849–850, 116 S.Ct. 2432 (emphasis added). Furthermore, the Supreme Court concluded that goodwill was valuable when a healthy corporation purchased a failing thrift because "the purchase is rational only because of the accounting treatment for the shortfall." *Id.* at 854, 116 S.Ct. 2432. Clearly, both these sources associate the value of supervisory goodwill with the purchase of a failing thrift by a healthy corporation. These sources do not, however, speak to whether supervisory goodwill has value in all situations and specifically when a *healthy* corporation acquires a *healthy* thrift.

"The value of goodwill is derived from the profitable uses to which an institution can put it." *Commercial Fed.*, 59 Fed.Cl. at 352. "By eliminating goodwill ... only the uses for which the goodwill might have been employed are taken. If it can be shown that the goodwill would not have been put to use under the actual circumstances by the institution, then despite there being a breach and loss of goodwill, there is no harm." *Id.* Plaintiff did not show that either FNB or First Madison were prohibited from taking an investment opportunity for lack of capital or leverage capacity. Mr. Walker testified that he was not aware of any investment opportunities First Madison was forced to pass up on and that, in fact, First Madison planned to shrink the thrift in the first few years after the sale.[33] Based on this, it

appears that First Madison did not need or desire additional leverage at the time of the sale, but was pursuing another strategy. Moreover, FNB itself could not find appropriate investment opportunities beginning over a year before the sale [34] and, thus, did not have a use for additional leverage. Because supervisory goodwill amortizes, if it cannot be leveraged, it is an expense. Without opportunities to invest, therefore, supervisory goodwill has no value and could even contribute to a thrift's losses.

Even if there were sufficient investment ventures available at the time of the sale of FNB or if First Madison could have predicted future opportunities to its satisfaction, the purchase of supervisory goodwill would have been an inefficient and even illogical method of increasing leverage. According to Mr. Walker's theories, First Madison would have paid approximately $130 million in cash, which does not amortize, for $213 million in supervisory goodwill, which amortizes and would "be a drag on earnings." *Suess v. United States*, 52 Fed.Cl. 221, 230 (2002). This simply makes no sense. It would have cost First Madison merely the transactional costs [35] to raise $213 million in "real capital, which, unlike goodwill, could be used to invest in real interest earning assets" and, invested appropriately, would have been available to First Madison long after the supervisory goodwill would have amortized to zero. *Id.* "[T]he kind of forebearance which goodwill represents would have no value to a

33. *See Pl.'s Ex. 159, Exhibit 7.* (First Nationwide Bank Financial Projection Summary Based on First Madison Projections). First Madison's strategy in purchasing FNB was to retain only FNB's California branches and sell off the remaining pieces of the thrift. *Tr. at 297–98.* Eventually, FNB grew into a much larger thrift and was sold again in 2002.

34. *See Def.'s Ex. 272* (February 25, 1993, FNB Board Meeting Minutes) ("He [Mr. Frazee, then CEO of FNB] also noted that in the current economic climate, it is not possible to invest cash in high earning assets."); *Def.'s Ex. 273* (March 25, 1993, FNB Board Meeting Minutes) ("Mr. Frazee said that the Bank continues to suffer from having a large amount of cash and cash-like assets on its balance sheet."); *Def.'s Ex. 277* (June 24, 1993, FNB Board Meeting Minutes) ("Mr. Mahoney said that the Bank would like to be slightly larger in asset size than it is at the

present time, and that it would also like to add higher yielding assets to its balance sheet.").

35. In *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed.Cir.2003) and *Home Savings of America v. United States*, 399 F.3d 1341 (Fed.Cir.2005), the Federal Circuit found that the cost of replacement capital in certain cases was not limited to transactional costs, but also included the costs of the higher rate funds that the thrifts were forced to obtain because they could not rely on supervisory goodwill. *Home Sav. of Am.*, 399 F.3d at 1354 (citing *LaSalle Talman*, 317 F.3d at 1374–75). This is inapplicable to the case at hand, however, because this is not a damages claim based on replacement capital and any evidence on whether First Madison may have had to pay a higher rate for funds because it was not able to purchase FNB's supervisory goodwill would be pure speculation.

well-capitalized" corporation like First Madison. *Id.* Plaintiff simply did not present factual evidence sufficient to convince this court that anyone would have paid for supervisory goodwill when it would have been less expensive to borrow the same amount in cash. Moreover, plaintiff did not explain why a sophisticated buyer like First Madison would exchange $130 million in cash for $213 million of supervisory goodwill, a net of $83 million in an unidentifiable, intangible, amortizing asset.

Despite the apparent illogic of a healthy corporation paying a significant sum for an unnecessary and likely useless asset that amortized and would, therefore, be an expense, Mr. Walker insisted that the bidding process for FNB was so competitive that the buyer would have bought whatever assets Mr. Walker chose to sell. This is simply not a credible assertion. For example, the second highest bidder for FNB, World Savings, certainly placed no value on supervisory goodwill. In an advertisement taken out in the *Washington Post* while Congress was debating on FIRREA, World Savings made the following statement: "Real, tangible capital is *cash*. Weak savings and loans, with their hordes of lobbyists, are fighting to convince members of Congress that goodwill should be kept in the legal definition of capital. Goodwill is nothing but *thin air* ...." [36] It is apparent, therefore, that World Savings, the runner-up bidder, would not have been interested in purchasing plaintiff's supervisory goodwill despite Mr. Walker's valuations. In reality, as plaintiff's expert Dr. William Hamm testified, the buyer would "have to be convinced that they are going to benefit by having that piece of paper [the Assistance Agreements]." [37] Furthermore, FNB's CEO at the time of the sale to First Madison stated in an affidavit for an unrelated case that he did not believe FNB could sell certain intangible assets that were associated with supervisory goodwill,[38] nor that First Madison had any "interest in acquiring such intangible assets as goodwill and states' rights." [39] Therefore, there is evidence that the runner-up bidder would not have placed any value on goodwill and that FNB did not believe that the actual purchaser was interested in intangible assets. Taken together, the court is persuaded that supervisory goodwill may not have even been an asset for sale had it been available.

At the summary judgment stage, this court noted that "Mr. Walker's models ... rest on a second questionable assumption—that a potential acquirer, given the advantages of cash and the disadvantages of supervisory capital, would nevertheless have accepted Mr. Walker's structuring and purchased the supervisory capital." *Granite II,* 58 Fed.Cl. at 780. Plaintiff failed to provide any factual evidence that a buyer would rather acquire supervisory goodwill with its attendant difficulties than hold onto cash. The court still finds that it is very unlikely that a buyer would have been interested in FNB's goodwill considering the potential problems gaining approval from the regulators to transfer the goodwill and use the goodwill in the way Mr. Walker describes in his models. In addition, plaintiff provided no factual evidence to counter the fact that because of the amortizing nature of goodwill, that it is an expense and eventually disappears, buyers may have looked unfavorably on the prospect of exchanging real capital—cash—for "thin air." Furthermore, because the value of goodwill lies solely in the ability to leverage, the lack of investment opportunities available at the time of the sale, described above, may very well have made bidders doubt Mr. Walker's confidence in the earning potential of supervisory goodwill.[40] As to Mr. Walker's divi-

---

36. *See Def.'s Ex. 175 at GMHW 525* (emphasis in original).

37. *Tr. at 2361.*

38. The asset in question was "states rights," essentially the ability to conduct business in a given state. These rights were often a benefit of supervisory transactions where a corporation bought a failing thrift in a state where it otherwise could not have opened branches.

39. *Def.'s Ex. 324 ¶¶ 7, 9* (Affidavit of Jack A. Frazee, CEO of FNB at the time of the sale to First Madison, in the case of *First Nationwide Bank v. Granite Savings Bank).*

40. Although Mr. Walker did value supervisory goodwill in his models in the same way he valued other assets he sold as part of FNB, it does not seem logical to use the same methods considering the unique nature of supervisory goodwill.

dend model, there was no evidence that anyone had dividended out the cash equivalent of supervisory goodwill before, which also may have caused a bidder pause particularly because such a move would have significantly altered FNB's capital position. Considering this litany of doubts, and Mr. Walker's failure to address them at trial, although Mr. Walker may very well have presented his models and valuation to potential buyers, there is no evidence that anyone would have been convinced by Mr. Walker's theories.

Furthermore, plaintiff was unable to present persuasive evidence that thrifts with supervisory goodwill sold at higher prices than those without. First, as detailed above, plaintiff did not put forth sufficient evidence that supervisory goodwill was *ever* transferred. Second, although plaintiff's expert witness Professor James attempted to show that a statistical analysis of pre-FIRREA sales of thrifts demonstrated that those thrifts with goodwill sold at a higher premium, his analysis was flawed and unconvincing.

According to Professor James, between 1983 and 1989, thrifts with goodwill sold at a higher median price to tangible book value [41] than those without goodwill. Professor James parsed his analysis by comparing thrifts with "significant" goodwill (equaling more than one percent of their assets) with those that had a lower percentage of goodwill or no goodwill. Professor James observed that goodwill was allegedly valuable because thrifts with significant goodwill sold for far more than their book value than those with some goodwill or those with no goodwill. Furthermore, even thrifts with some goodwill sold for more over their tangible assets than those without any goodwill.

In order to provide more meaning to his results, Professor James chose to compare the sales of thrifts pre-FIRREA with the sales of banks during the same time period. His theory behind this was that because banks could not use goodwill to meet capital requirements, goodwill should not have add-

ed value to banks because goodwill did not offer additional leveraging ability. Therefore, if banks with goodwill sold for more over their tangible book value than banks without goodwill, then the results from his thrift study may be due to other factors than the value of the uses of goodwill for thrifts. Professor James thereby used banks as his control. His inspection and comparison of the data supported his theory because banks with goodwill actually sold at a lower price to tangible book ratio than banks without goodwill. Professor James also performed the same analysis on banks and thrift sales between 1990 and 1994 and contrasted the results to the 1983 to 1989 sales. His examination showed that post-FIRREA, thrifts with significant goodwill sold at a lower price to tangible book ratio than those with some goodwill or no goodwill. Professor James claimed that this further supported his theory because it clearly indicated that once goodwill could no longer be used to meet capital requirements, thrifts with goodwill were less valuable.

Defendant's expert Dr. Anjan Thakor was extremely critical of Professor James' analysis of the data on thrift sales. Most of his comments centered on the lack of controls in Professor James' statistical examination of the thrift data. Dr. Thakor pointed out that the thrifts with goodwill were much larger than those without goodwill, the geographic distribution of thrifts with goodwill was very different from those without, the median sales dates are almost a year apart, and the capital positions of each were dissimilar.[42] Dr. Thakor further testified that banks could not be used as a control because the medians for sale date, size, asset size, and capital position as well as the geographic distribution of the banks is very different from the medians for thrifts in Professor James' data set. Dr. Thakor also presented a statistical analysis showing that "thrifts that were above median asset size had higher price to tangible book than acquisitions of thrifts below median asset size."[43] Dr. Thakor also demonstrated that thrifts with goodwill sold

---

41. The "median price to tangible book ratio" is essentially the difference, on average, between the book value of a thrift and its selling price.

42. *See Def.'s Ex. 815; Tr. at 2929–2930.*

43. *Tr. at 2933.*

at a higher price to tangible book ratio both before and after FIRREA was passed, apparently invalidating Professor James' theory.

The court finds Professor James' testimony and statistical analyses to be unreliable and unpersuasive. The court agrees with Dr. Thakor that there were many factors that likely effected the prices of thrifts pre-FIRREA more than goodwill. Dr. Thakor's testimony regarding the significance of asset size was particularly compelling, primarily because he arrived at his result by using the same methodology as Professor James. Dr. Thakor's ability to come to a very different conclusion based on the same data using the same processes significantly diminishes the credibility of Professor James' testimony. In addition, it is apparent that banks were not an appropriate control for Professor James' statistical investigation, and, therefore, Professor James' analysis amounted to an uncontrolled experiment. Moreover, although Professor James testified that he had run a regression on the thrift data that supported his hypotheses, he did not present it to the court. It would seem that if plaintiff had a complete statistical picture provided by a regression that supported its theories on value, such evidence would be submitted to the court. All of these factors combined significantly diminish the probative value of Professor James' testimony. Clearly, the answer to the Federal Circuit's question regarding whether thrifts with goodwill sold for a higher price is "no".

Therefore, because plaintiff did not provide adequate evidence of pre–FIRREA sales where thrifts included supervisory goodwill or that thrifts with supervisory goodwill sold for higher prices, it did not satisfy its burden of proof. Moreover, Mr. Walker did not have a sufficient factual basis to conclude that FNB could have sold for a higher price if it would have been able to include supervisory goodwill in the real world because there is evidence that First Madison would not have had a use for additional leveraging power. Accordingly, the court finds that plaintiff did not provide a factual basis for the conclusion that supervisory goodwill had value to First Madison or any other well-capitalized corporation and FNB could, therefore, have sold for more.

## C. Price

The final issue remanded to this court by the Federal Circuit is:

> Does Walker have any actual factual basis for determining the alleged higher amount for which First Nationwide could have been sold if it had included "supervisory goodwill"? How much additional value could the thrift have brought if the goodwill was included in the deal? What is the basis for that calculation?

*Granite III*, 416 F.3d at 1383.

In its post-trial briefing and closing argument, plaintiff stated that it was seeking "general damages." [44] " '[G]eneral damages' ... are damages measured by the loss of the value of the performance promised by the breaching party. In other words, such damages are 'based on the value of the very thing to which the plaintiff was entitled ..., they encompass paper losses or unrealized losses, and ... they are determined as of a particular date, usually by market measures.' " *New Valley Corp. v. United States*, 72 Fed. Cl. 411, 414 (2006) (quoting 24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:1, at 11 (4th ed.2002); 3 Dan B. Dobbs, LAW OF REMEDIES § 2.2(3), at 40–41 (2d ed.1993)).[45] By this definition, it would seem that a "general damages" calculation would be how much value FNB lost due to the elimination of goodwill on the day FIRREA was passed, not the amount plaintiff lost on the sale of FNB because of the breach. Therefore, we do not view plaintiff's claim as one for "general damages."

---

44. *Plaintiff's Post–Trial Reply Brief* at 15; *Closing Arg. Tr. at 145.*

45. "Dobb's Law of Remedies provides a useful accounting metaphor that captures the difference between general damages and consequential damages: 'General damage awards aim at putting the plaintiff's balance sheet in the position it would have been in upon performance,' *id.* § 12.2(3), at 40, whereas 'the consequential damages measure emphasizes income or loss, or cash flow, including losses that may result far into the future,' " *id.* § 12.2(3), at 42. *New Valley Corp.*, 72 Fed.Cl. at 414 n. 2.

Generally, damages in *Winstar*-related cases are based on one of three theories: expectancy damages, restitution, or reliance damages. *See e.g., Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374 (Fed.Cir. 2001). Mr. Walker's models are, in reality, claims for expectancy damages. Expectancy damages are "the benefits the nonbreaching party expected to receive in the absence of a breach." *Cal. Fed. Bank v. United States,* 395 F.3d 1263, 1267 (Fed.Cir.2005) (citing *Glendale,* 239 F.3d at 1376). Plaintiff's claim is essentially that it expected to be able to sell its contract rights as part of FNB when it contracted with the government and was unable to reap that benefit.

Although the court does not seek to place undue emphasis on a technical damages title, *see Caroline Hunt Trust Estate v. United States,* 65 Fed.Cl. 271, 299 (2005), it does conclude that the type of damages sought in this case varies the burden of proof. This court has held that "[w]ith respect to explaining its expectancy damages ... plaintiff bears the burden of propounding a realistic but-for scenario...." *Coast Fed. Bank, FSB v. United States,* 48 Fed.Cl. 402, 430 n. 25 (2000); *see also Southern Cal. Fed. Sav. & Loan Ass'n v. United States,* 57 Fed.Cl. 598, 633 (2003) (explaining that "establish[ing] a 'but-for' world ... is ordinarily required to state a valid claim for expectancy damages"). In other words, plaintiff bears the burden of demonstrating "what might have been...." *Glendale,* 239 F.3d at 1380. Accordingly, because plaintiff in this case is seeking expectancy damages, it is incumbent upon it to establish a plausible "but-for" world. *See also, Bluebonnet Savings Bank FSB v. United States,* 67 Fed.Cl. 231, 237–38 (2005) *aff'd Bluebonnet Savings Bank FSB v. United States,* 466 F.3d 1349 (Fed.Cir.2006).

After the passage of FIRREA, FNB went through extensive changes. At trial, however, plaintiff seemed to ignore the effects of these reforms and, therefore, did not present a clear picture of the "but for" world. Of primary concern is the $250,000,000 contribution to FNB by its parent company after the passage of FIRREA. Plaintiff claimed in its closing argument that this capital infusion is irrelevant because the value of the opportunities supervisory goodwill presents would always be the same.[46] This seems illogical. Supervisory goodwill only has value as part of a going concern.[47] As the value of a business fluctuates, so do its individual assets, particularly unidentifiable intangibles such as goodwill. The return on assets and discount rates that Mr. Walker used in real life depended, at least in part, on the profile of FNB in 1994, after the capital infusion. If there had not been a $250,000,000 infusion, FNB would have looked very different and likely had a lower value. In addition, after FIRREA, FNB was extensively restructured,[48] and ended up a profitable thrift despite a rocky period post-FIRREA. Therefore, although Mr. Walker used the same numbers to calculate the value of FNB's supervisory goodwill in this case as he used in real life to compute the value of other assets, these figures are not based on the "but for" FNB. Without a clear picture of FNB absent the breaching provisions of FIRREA, Mr. Walker's calculations are merely hypothetical.

At both the summary judgment phase and the appeal to the Federal Circuit, plaintiff asserted that Ford infused $250,000,000 of capital into FNB because, post–FIRREA, the regulators insisted that FNB strengthen its capital ratios, and made a damages claim on that basis. *See Granite III,* 416 F.3d at

---

**46.** *Closing Argument Tr. at 123–124.*

**47.** As plaintiff's witness Roger Orders testified goodwill "relates to ... a particular set of assets or operations. It doesn't have value unto itself." *Joint Exhibit 1 at 217–18.*

**48.** Plaintiff's witness Mr. Mahoney testified that FNB

restructured the bank by moving what were considered to be problem assets out of the

bank and into Ford, basically, into First Nationwide's holding company. Real estate development assets and troubled commercial loans would be examples of that. We did get another $250 million from Ford Motor Company or some number of that order of magnitude. We merged our Pathway and Cardinal operations into the bank. That brought in more assets, but because they had excess capital at the time, it improved our overall position on a weighted basis. *Tr. at 1254.*

1377–78; *Granite II,* 58 Fed.Cl. at 770. At trial, the evidence presented bore out the fact that the capital infusion was a result of FIRREA's new capital requirements. As plaintiff's witness Mr. Mahoney, FNB's chief financial officer when Congress passed FIRREA, stated "the bottom line is that Ford paid in about $250 million." [49] Because plaintiff did not present evidence on what FNB would have looked like in the "but for" world without the $250 million from Ford, it has not demonstrated a valid claim for expectancy damages. Moreover, as a result, Mr. Walker's calculations did not prove plaintiff's damages "with reasonable certainty." *Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 347, 351, 352).

Even if the court could assume that Mr. Walker used appropriate return on asset and risk figures, his calculations ignore the realities of supervisory goodwill. First and foremost, Mr. Walker does not seem to take into account the expense of the amortization of goodwill. If there had been no $250 million infusion, we can only assume that FNB would have continued to depend on supervisory goodwill to meet regulatory requirements. As the goodwill amortized, it would have had to be replaced with real cash capital. Nowhere in Mr. Walker's testimony or expert reports does he even acknowledge this, much less explain how he compensated for it.

Mr. Walker's calculations are patently unrealistic even if the court ignores the likely effects of the capital infusion. "Due to its nature, any supervisory goodwill ... would have been the last increment of capital leveraged." *Commercial Fed.,* 59 Fed.Cl. at 354. Therefore, it is counter-intuitive to compute the value of supervisory goodwill in the same manner as you would a tangible asset, as Mr. Walker did in his models. None of plaintiff's witnesses explained why, despite its unique characteristics, supervisory goodwill would be looked at by a buyer in the same manner the buyer would look at tangible assets. For these reasons, we consider Mr. Walker's calculations unreliable.

Finally, despite the fact that Mr. Walker may have used his models in real life if he had the opportunity, what constitutes "reasonable certainty" in the financial world is not definite enough to pass muster in the legal realm. Mr. Walker would not only have had to calculate the value of supervisory goodwill, but also convince a buyer that his calculations were correct. Furthermore, he would have had to persuade the buyer that there were investments available that would produce the same rate of return that Mr. Walker assumed. As to his dividend model, First Madison would have had to have some interest in taking the capital out of the thrift, but plaintiff did not present any evidence to support this. In fact, in the years following the acquisition, First Madison retained high levels of capital ratios, well above what was required by the regulators. Mr. Walker apparently ignored this fact and instead worked on the assumption that everyone would prefer dividends to higher capital ratios that would protect the bank in the risky and ever changing savings and loans world. It seems questionable that First Madison would have spent $130 million for the opportunity to dividend a large amount of cash out of FNB, depleting FNB's tangible capital and thereby putting First Madison's new investment in a significantly riskier position.

According to Mr. Walker, the value of FNB's supervisory goodwill was sixty cents on the dollar. Plaintiff has not, however, provided a sufficient factual basis for this figure. Plaintiff failed to provide the court with a clear picture of what FNB would have looked like absent the breach, making the underlying assumptions of Mr. Walker's calculations untenable and his result unreliable. Furthermore, plaintiff provided no evidence that First Madison would have agreed with Mr. Walker's valuation and chosen to spend a large amount of cash in exchange for an unidentifiable intangible asset. Therefore, plaintiff did not prove that anyone would have paid an additional $130 million for FNB absent the breach.

### Conclusion

The Federal Circuit remanded this case on three very specific factual questions. For

49. *Tr. at 1213.*

the above-stated reasons, the court finds that plaintiff did not adequately answer these questions, and, therefore, did not provide a factual basis for its claimed damages. The Clerk of the Court is directed to enter judgment in favor of defendant. No costs.

IT IS SO ORDERED.